

U.S. Department of Justice

*Joshua S. Levy*
*Acting United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

December 1, 2023

Keith Halpern, Esq.
83 Atlantic Avenue
Boston, Massachusetts 02110

    Re:    Jaclyn McQueen

Dear Mr. Halpern:

    The Acting United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Jaclyn McQueen ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

    1.    <u>Change of Plea</u>

    As soon as practicable, Defendant will waive Indictment and plead guilty to Count One of the Information charging her with tampering with a consumer product, in violation of 18 U.S.C. §1365(a)(4). Defendant admits that Defendant committed the crime specified in this count and described in the attached statement of facts and is in fact guilty.

    2.    <u>Penalties</u>

    Defendant faces the following maximum penalties for Count One: incarceration for ten years; supervised release for three years; a fine of $250,000; a mandatory special assessment of $100; and restitution.

    3.    <u>Sentencing Guidelines</u>

    The parties agree, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 22:

        a)    Defendant's base offense level is 25 pursuant to USSG §2N1.1(a);

1

b) Defendant's offense level is increased by 2 levels, because Defendant abused a position of trust, and used a special skill, in a manner that significantly facilitated the commission or concealment of the offense (USSG §3B1.3);

c) Defendant's offense level is decreased by 3 levels, because Defendant has accepted responsibility for Defendant's crime (USSG §3E1.1); and

d) Defendant's offense level is decreased by 2, because Defendant has no criminal history points (USSG §4C1.1).

Defendant understands that the Court is not required to follow this calculation or even to sentence Defendant within the Guidelines and that Defendant may not withdraw Defendant's guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.   <u>Sentence Recommendation</u>

The U.S. Attorney agrees to recommend the following sentence to the Court:

a) incarceration for a period of 20 months;

b) a fine within the Guidelines sentencing range as calculated by the parties, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

c) 36 months of supervised release;

d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing; and

e) restitution as determined by the Court.

5.   <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b) Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence, regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6.   <u>Civil Liability</u>

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

7.   <u>Breach of Plea Agreement</u>

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to

3

withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

8. <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

9. <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

* * *

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Kelly Lawrence.

Sincerely,

JOSHUA S. LEVY
Acting United States Attorney

By: *[signature]*

PATRICK M. CALLAHAN
Deputy Chief, Health Care Fraud Unit

*[signature]*

KELLY BEGG LAWRENCE
Assistant U.S. Attorney

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Jaclyn McQueen
Defendant

Date:     12/04/2023

I certify that Jaclyn McQueen has read this Agreement and that we have discussed what it means. I believe Jaclyn McQueen understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
Keith Halpern
Attorney for Defendant

Date:  12/5/23

## STATEMENT OF FACTS

Beginning in or about February 2020 and continuing through in or about May 2020, MCQUEEN diverted and diluted oxycodone from a Massachusetts rehabilitation center where she was employed as a nurse (the "Rehabilitation Center").

Oxycodone was a Schedule II controlled substance. Both liquid oxycodone and oxycodone pills (collectively, "oxycodone") were opioids used for pain relief. Oxycodone was prescribed to some of the patients at the Rehabilitation Center.

In her capacity as a nurse, MCQUEEN had access to oxycodone and other opioids prescribed to patients at the Rehabilitation Center.

Beginning in or about February 2020 and continuing through in or about May 2020, MCQUEEN diverted and diluted oxycodone from the Rehabilitation Center. She began by taking oxycodone and other opioid pills that otherwise would have been discarded and not administered to patients. For example, when a patient was given a supply of oxycodone pills when they left the facility and returned with unused oxycodone pills, Rehabilitation Center staff, including MCQUEEN, were directed to "waste," or destroy, the unused pills. Instead of wasting the unused oxycodone pills, MCQUEEN consumed them herself.

MCQUEEN also consumed and diluted oxycodone in liquid form, taken from 2.5 ml/2.5 mg liquid oxycodone syringes that were prescribed to her patients and stored on her medication carts. The liquid oxycodone syringes were stored in individual plastic bags that had a small hole to enable air to escape the packaging. MCQUEEN removed the syringes from the bags through the hole, consumed a portion of the oxycodone, refilled the syringe with water to replace the oxycodone she consumed, and replaced the syringe in the plastic bag through the hole from which she had removed it. MCQUEEN then returned the diluted syringes to her medication carts. MCQUEEN did not administer the diluted syringes to her patients during her shifts. However, she shared the medication carts with other nurses who could have administered the diluted oxycodone to patients.

MCQUEEN consumed diverted opioids during most of her shifts between February 2020 and May 2020, when her tampering was discovered by the Rehabilitation Center.

MCQUEEN admitted to federal agents that she diverted opioid pills and consumed and diluted liquid oxycodone syringes on her medication carts.

The liquid oxycodone syringes that MCQUEEN diluted were manufactured by a pharmaceutical company in Minnesota.

The U.S. Food and Drug Administration's Forensic Chemistry Center tested 44 oxycodone syringes on the medication carts that MCQUEEN used and determined that 40 of the syringes were diluted, in that they contained between 2% to 33% of the declared concentration of oxycodone.