UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **United States of America** <br> v. <br> **Jaclyn McQueen** | No. 23-cr-10318-JEK |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Jaclyn McQueen submits this memorandum to assist the Court in sentencing. To determine the appropriate sentence, "the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 555 U.S. 350, 351 (2009). The defendant urges the Court to impose a sentence of probation for 3 years as "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *United States v. Kimbrough*, 552 U.S. 85 (2007); *United States v. Booker*, 543 U.S. 220 (2005).

**Factual Background**

During February – May 2020, Ms. McQueen first diverted and then diluted oxycodone from her long-term nursing home patients at Hebrew Rehabilitation Center in Dedham. Until April, her use was limited to keeping pills that were to be discarded. As her use escalated, she began tampering with liquid oxycodone syringes by removing and consuming much of the medication while at work and replacing it with water. This dilution reached its height over Memorial Day weekend, when Ms. McQueen worked extended shifts, and the dilution was detected. There is no evidence that any patient received a diluted syringe, but Ms. McQueen is painfully aware of the risks she created.

Ms. McQueen's opioid diversion was not triggered by her dealing with COVID patients, but her increased use and syringe dilution was in tandem with her efforts to cope with the previously unimaginable stressors of dealing with increasing numbers of COVID patients. By mid-March, COVID had arrived at the facility and spread like wildfire. Many nurses stopped working, rather than risk exposure. Ms. McQueen's work hours dramatically increased, regularly working 60-80 hours/week. Her participation in AA dwindled. Family members were denied access to the facility and said their goodbyes to dying relatives on FaceTime. Ms. McQueen and her colleagues struggled to care for the sick and dying and communicate with their families. At least ten of Ms. McQueen's patients died of COVID during her last two months of work. She contracted COVID herself in mid-April and was out for ten days. She went through opioid withdrawal while she was sick with COVID. She promised herself that she would stay off opiates when she went back to work, but it was a promise that she was unable to keep.

The last time that Ms. McQueen used an opiate was Memorial Day 2020, her last day of work at the nursing home. She took prescription Adderall until September 5, 2020 and calculates her sobriety from that date. She's been clean, without relapse, without a dirty drug test, for four years.

Ms. McQueen's nursing license was summarily suspended in July 2020. She did not contest it. The terms of suspension allowed the Nursing Board to reinstate licensure if the Board found it to be in the best interests of the public. Around this same time, she was visited by D.E.A. agents and admitted her conduct. Over two years passed before she again heard from anyone in law enforcement. The same D.E.A. agents delivered a Target Letter to her in September 2022.

Soon after the loss of license, Ms. McQueen initiated communications with the Nursing Board's Substance Abuse Rehabilitation Project (SARP). Her formal entry into SARP was delayed because of issues relating to COVID. One of the conditions of participation was extensive therapy and drug abuse counselling. As COVID escalated, it became increasingly difficult for people to find therapists, and Ms. McQueen was no exception. SARP managers urged that Ms. McQueen delay the program until she had counselling in place. While searching for a therapist, she participated in AA on Zoom. Even though she did not formally enter SARP until May 2022, she began drug testing with SARP in May 2021.

Ms. McQueen entered SARP in May 2022. A Consent Agreement for SARP Participation is provided at Attachment 1. The conditions of participation included extensive counselling, toxicology screens, 12-step meetings, and regular self-assessment reports. Attachment 2.

SARP is intended to provide substance abusers a way back into nursing after a minimum of six months in the program. In December 2022, Ms. McQueen's mental health and substance abuse counsellor, Natalie Allen, sent a letter to the Nursing Board, recommending that Ms. McQueen be permitted to return to nursing. Attachment 3. In January 2023, Ms. McQueen' nursing license was reinstated. In February 2023, SARP, with the approval of the Board of Registration in Nursing, amended the Consent Agreement to allow Ms. McQueen to return to nursing practice, including medication administration subject to various conditions. Attachment 4.

In June 2023, Ms. McQueen was offered a nursing position at Harvard Vanguard, Atrius Health (Atrius). An approval letter from SARP and the Board of Registration in

Nursing is provided at Attachment 5. Ms. McQueen disclosed her situation with the Nursing Board and SARP in the application process. Her supervisor, Katelyn Shiner, BSN, RN, was required to provide SARP with quarterly status reports. Ms. Shiner was aware of the Target Letter and assisted counsel in trying to dissuade the government form pursuing criminal charges. In August 2023, Ms. Shiner provided counsel with a letter to give to the government. Attachment 6. Ms. Shiner wrote that Ms. McQueen "was up front about her battle with addiction at our interview." She concluded, "She is very much an asset to our nursing team and I look forward to working with her over the coming year."

Ms. McQueen's AA sponsor, Nancy Flynn, also prepared a letter urging the government to forbear. Attachment 7.

In a self-report to SARP provided on July 27, 2023, Ms. McQueen wrote: "Started a nurse position full time and love it … Will be 3 yrs sober on 9/5/23, have a job in my group, am active in program, so grateful to be in recovery and proud of how far I've come." Attachment 8.

Ms. McQueen's return to nursing did more than evidence her commitment to sobriety and provide self-worth. Her husband works as a security guard. His income is about $50,000 year. Ms. McQueen's income as a nurse has always exceeded her husband's income. She has frequently struggled with depression. The loss of her job at the Hebrew Rehabilitation Center, the suspension of her nursing license, the loss of income and its impact on her family, the July 2020 visit from D.E.A. agents, the shame and guilt of her addiction and drug-seeking, struggling to find work as a waitress, all of this contributed to depression. Returning to nursing with Atrius, with an annual salary of approximately $100,000, was a huge accomplishment in overcoming it.

Ms. McQueen told her supervisor, Ms. Shiner, about the Target Letter, and the initiation of a criminal case in December 2023, and her pleading guilty in early January 2024. Ms. Shiner was supportive and told Ms. McQueen that she considered her accomplishments a success story. Ms. Shiner did not feel obliged to report news of the criminal case to others. On January 16, 2024, the government issued a press release, headlined, "Former Nurse Pleads Guilty to Tampering with Oxycodone." Attachment 9. Ms. McQueen learned of the press release that night, when the mother of one of her children's friends messaged her. Ms. McQueen texted Ms. Shiner the following morning and told her about it. Ms. Shiner responded, "Didn't see it. Let's talk this afternoon. Don't worry. Your job performance speaks for itself. ❤️." Attachment 10.

Shortly before the start of Ms. McQueen's employment with Atrius, Atrius and Harvard Vanguard were acquired by a national healthcare company, Optum. Ms. Shiner felt it necessary to tell Optum's H.R. Department about the press release. They agreed with Ms. Shiner's perception of a success story. Ms. Shiner reassured Ms. McQueen that H.R. was supportive. But H.R. must have felt it necessary to further report the press release, and whoever received that report was not so supportive. On February 2nd, Ms. McQueen was terminated.

If anything was going to trigger a relapse, it would have been the fall-out from the press release: the loss of a nursing job she loved; the loss of income; her teen-age children coming home from school, reporting that their friends had asked about the case and whether their mom was going to jail. But she did not relapse.

Instead, Ms. McQueen went back to work as a waitress, even though she had to work night shifts that took her away from her family. She maintained her participation in

SARP and AA. At the Court's suggestion, she participated in Probation's Restorative Justice Program. And she never gave up the hope of returning to nursing.

On August 15th, Ms. McQueen was offered a position as a Registered Nurse with Charles River Recovery. Attachment 11. Her income will be comparable to what she lost at Atrius. She will be working with those suffering from substance abuse, so that others may find their own success stories. Her acceptance of the position is awaiting SARP's formal approval, which she expects soon.

Additional letters in support of Ms. McQueen are provided at Attachment 12.

**Incarceration is Not Warranted.**

Ms. McQueen entered into a plea agreement in which the government agreed to recommend a sentence of 20 months incarceration. The agreement was entered into in December 2023. Perhaps Ms. McQueen's accomplishments and conduct since then will give the government pause. But even if the government now recommends a shorter term of imprisonment, the recommendation would be out of step with the circumstances of this case and comparable cases.

In prior cases involving similar tampering by health professionals, the government has argued that most compelling reason for a prison sentence was "the need to deter similar offenders," and that the "only way to afford adequate deterrence for medical professionals who consider intentionally tampering with controlled substances is to impose a meaningful incarcerative sentence." E.g., United States' Memorandum in Aid of Sentencing, Document 31, p.8, *United States v. Candice Mangan*, 22-cr-10144-FDS, 9/13/23. Ms. McQueen tampered with medications roughly 4 ½ years ago. She received a Target Letter almost 2 ½ years after her misconduct. If her incarceration truly was needed

6

to send a message to potential offenders, the government likely would have sought to send that message a long time ago.

Candice Mangan was an EMT paramedic. She tampered with fentanyl vials in ambulances, replacing fentanyl with saline. She participated in the Restorative Justice Program. Her Guideline range was 51 – 63 months. Judge Saylor imposed a sentence of 30 days incarceration and 3 years supervised release. Her attorneys wrote an excellent sentencing memo, and rather than counsel lifting numerous passages, the Court may review it at Document 32. Among many compelling arguments, her attorneys point out that the very harsh numbers in §2N1.1 were prompted by concern over mass poisoning, akin to the widespread Tylenol/Cyanide tampering and fatalities of 1982, adding:

> The Application Notes make the worry [of permanent or life-threatening bodily injury] explicit, with one caveat:
>
> The base offense level reflects that this offense typically poses a risk of death or serious bodily injury to one or more victims; or causes, or is intended to cause, bodily injury. Where the offense posed a substantial risk of death or serious bodily injury to numerous victims, or caused extreme psychological injury or substantial property damage or monetary loss, an upward departure may be warranted. **In the unusual case in which the offense did not cause a risk of death or serious bodily injury, and neither caused nor was intended to cause bodily injury, a downward departure may be warranted.**
>
> U.S.S.G. §2N1.1, cmt. n.1 (emphasis added).

Mangan Sentencing Memorandum, p. 13.

Like Ms. Mangan's case, Ms. McQueen's addiction-driven tampering did not create a risk of death or serious injury. At worst, a patient would have been left in pain that could have been relieved. Assuming the patient could communicate the problem, or staff could observe it, the harm could be readily remedied. This is not to minimize the


misconduct; but it is to recognize that the severe Guideline numbers were formulated with a very different degree of harm in mind.

The government's urging that a prison sentence of 38 months be imposed on a nurse in a more egregious case was flatly rejected by Judge Kelly in *United States v. Hugo Vieira*, 22-cr-10052-AK. For two years, at two medical facilities, Mr. Viera regularly stole fentanyl, replacing it with saline. The amount of his tampering dwarfed the conduct of Ms. McQueen. The fentanyl he used was intended for surgical patients, and a number of those patients complained about excruciating pain from procedures that should have been painless. His Guideline range was 51-63 months. Judge Kelly imposed a sentence of Probation for 5 years, with the first year in home detention.

Ms. McQueen does not require time in prison to recognize the seriousness of her criminal conduct. Other health professionals, if made aware of what she has gone through, do not need the added imagined awareness of time in prison to deter them from similar conduct, if they can be deterred. The unfortunate reality is that the concept of deterrence through punishment is premised upon a voluntariness that is grossly compromised by drug addiction. Ms. McQueen has turned her life around, not because she was deterred by the threat of prison, but because she was determined to be a good mother, a good spouse, and a good nurse. She will be doing far more to deter drug-seeking behavior working at Charles River Recovery, where her assistance to others will be real, not theoretical, than this Court could ever accomplish by imagining that a prison sentence will prevent others from committing similar wrongdoing.

Home detention would be counter-productive and is unnecessary. Aside from work, almost all her time out of the house is for the benefit of her family: buying

groceries, taking her kids to school, church activities and sports. She regularly attends AA meetings. The only other outside-the-home activity she regularly does for herself is exercise and going to the gym.

She remains involved in SARP and is drug-tested. If that testing stops while Ms. McQueen is on probation, then, depending on when that occurs, it may be appropriate to add a condition for testing.

Ms. McQueen began her path to sobriety long before this criminal case was initiated. Further punishment is not needed or appropriate to keep her on that path.

## CONCLUSION

Ms. McQueen urges that a sentence of probation for 3 years is sufficient and appropriate to achieve the goals of sentencing.

JACLYN McQUEEN
By her Attorney,

/s/ *Keith Halpern*
Keith Halpern, BBO # 545282
572 Washington Street, Suite 19
Wellesley, MA 02482
617-722-9952
ksh@keithhalpern.com

CERTIFICATE OF SERVICE
I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 4, 2024.

/s/ *Keith Halpern*